JOSEPH P. RUSSONIELLO, CSBN 44332
United States Attorney
JOANN M. SWANSON, CSBN 88143
Assistant United States Attorney
Chief, Civil Division
EDWARD A. OLSEN, CSBN 214150
Assistant United States Attorney

450 Golden Gate Avenue, Box 36055
San Francisco, California 94102
Telephone: (415) 436-6915
FAX: (415) 436-6927

Attorneys for Defendants

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| JIN WU and CHANG ZHANG,<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>ALBERTO GONZALES, Attorney General of the United States; MICHAEL CHERTOFF, Secretary of the Department of Homeland Security; EMILIO T. GONZALEZ, Director of United States Citizenship and Immigration Services,<br><br>　　　　Defendants. | No. C 07-3118-PVT<br><br>**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Date:　February 12, 2008<br>Time:　10:00 a.m. |

## I. INTRODUCTION

The plaintiffs, husband and wife, are natives and citizens of China who filed Form I-485 applications to adjust their status to lawful permanent resident with the United States Citizenship and Immigration Services (USCIS) on April 27, 2005. The applications have not yet been adjudicated. On June 13, 2007, the plaintiffs filed an action in this Court, seeking an order directing USCIS to adjudicate their I-485 applications. The defendants hereby submit their motion for summary judgment.

## II. BACKGROUND

**A. Adjustment of Status**

Section 245 of the Immigration and Nationality Act, codified at 8 U.S.C. § 1255, authorizes USCIS to adjust to permanent residence status certain aliens who have been admitted into the United States. However, adjustment of status is committed to the Attorney General's discretion as a matter of law. Section 1255(a) expressly provides:

> The status of an alien who was inspected and admitted or paroled int the United States ... *may* be adjusted by the Attorney General, *in his discretion* and under such regulations as he may prescribe, to that of an alien lawfully admitted for permanent residence[.]

8 U.S.C. 1255(a) (emphasis added).

The general requirements for an employment-based I-485 application for adjustment of status is that the alien is the beneficiary of an approved I-140 visa petition (or whose spouse has adjusted status as a beneficiary), is in lawful immigration status on the date the I-485 application is filed, has a visa number immediately available under the annual per-country and preference category quota, and is not inadmissible to the United States under listed statutory grounds that include health-related, criminal, and national security provisions. Declaration of Gerald Heinauer ¶ 8.

Significantly, the statute does not set forth any time frame in which a determination must be made on an I-485 application to adjust status. Nor is any time frame specified in the regulations setting forth the procedures for aliens to apply to adjust status. *See* 8 C.F.R. § 245 et. seq.

While the application process is occurring, an applicant may apply for and receive employment authorization for the entire time that his or her I-485 application is pending. Heinauer Declaration ¶ 27. Moreover, most I-485 applicants apply for and receive what is called "advance parole," which enables them to travel abroad during the pendency of their application. *Id.*

**B. USCIS Service Centers**

The USCIS has five Service Centers throughout the United States, each of which has jurisdiction over certain types of applications and petitions. Heinauer Declaration ¶ 19. The Service Centers fulfill part of the USCIS responsibility to adjudicate benefit applications and are allocated part of the USCIS adjudication resources. *Id*. In order to maximize productivity, the Service Centers have no public interface and process only petitions and applications that do not

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
C 07-3118-PVT                               2

require personal interview. *Id.*

The Nebraska Service Center, at which the plaintiffs' I-485 applications are pending, is responsible, along with the Texas Service Center, for processing employment-based I-485 applications, like the plaintiffs' applications. *Id.* During fiscal year 2007 alone, the Nebraska Service Center completed adjudication of 919,966 applications and petitions. Heinauer Declaration ¶ 20. The Nebraska Service Center currently has approximately 187,930 employment-based I-485 applications pending, of which 70,579 are awaiting completion of FBI name checks. Heinauer Declaration ¶ 21.

**C. Background Checks**

Before an alien's I-485 application can be adjudicated, USCIS, in conjunction with the FBI, conducts several forms of security and background checks to ensure that the alien is eligible for the benefit sought and that he or she is not a risk to national security or public safety. Heinauer Declaration ¶ 11. *See* 8 U.S.C. § 1105(a) (authorizing "direct and continuous liaison with the Directors of the Federal Bureau of Investigation and the Central Intelligence Agency and with other internal security officers of the Government for the purpose of obtaining and exchanging information for use in enforcing the provisions of this chapter in the interest of the internal and border security of the United States").

These checks currently include: (1) an FBI name check, which is run against FBI investigative databases compiled by law enforcement agencies including administrative, applicant, criminal, personnel and other files; (2) an FBI fingerprint check, which provides information relating to criminal background within the United States; and (3) a check against the Interagency Border Inspection System (IBIS), which contains records and information from more than 20 federal law enforcement and intelligence agencies including the Central Intelligence Agency (CIA), FBI, the Department of State, DHS Customs and Border Protection (CBP) and other DHS agencies, and is used to compile information regarding national security risks, public safety concerns, and other law enforcement concerns. Heinauer Declaration ¶ 11.

These law enforcement checks have revealed significant derogatory information on various alien applicants for immigration benefits, including applicants seeking permanent residency,

which has resulted in the alien being found ineligible for the benefit and USCIS's denial of the application. Heinauer Declaration ¶ 12. These law enforcement checks have also resulted in aliens being arrested by law enforcement agencies or charged with removability from the United States. *Id.* In many instances, the disqualifying information on the alien has been discovered as a result of the IBIS or FBI name checks. *Id.*

Since the terrorist attacks of September 11, 2001, the need to conduct more rigorous and thorough background checks on aliens who are seeking immigration status in the United States has required procedures that sometimes result in individuals not receiving an adjudication of their immigration application as quickly as in the past. Heinauer Declaration ¶ 13. In order to ensure national security and public safety, as well as to reduce the waiting time for adjudication of applications, USCIS is currently working with the Department of Justice and other agencies to develop improved procedures that will ensure that all of the background checks are completed and the results considered as quickly as possible. *See id.* However, the public safety requires USCIS to make certain that the checks have been done before it adjudicates any application or petitions and before it issues any immigration status documents to such persons. *See id.*

Since September 11, 2001, the USCIS has submitted millions of name check requests to the FBI, thus taxing that agency's resources and creating a backlog. Heinauer Declaration ¶ 16. During the initial submission period of December 2002 and January 3002, USCIS submitted almost 3 million names to the FBI. *Id.* Delays in adjudication caused by pending FBI name checks are lengthy in some cases. Heinauer Declaration ¶ 17. As of November 21, 2007, USCIS reported 316,420 FBI name check cases pending, with 54,639 FBI name checks pending more than 24 months. *Id.*

Cases at the Nebraska Service Center in which the pending FBI name check is the only impediment to final adjudication are audited on a weekly basis in order to identify those in which a response from the FBI has been received. Heinauer Declaration ¶ 22If a response to the FBI name check request is not received within two weeks, the file is sent to a "FBI Name Check" shelf to await a response. Herring Declaration ¶ 13. All files on the FBI Name Check shelf are audited regularly in order to identify those in which a response from the FBI has been received. *Id.* This

audit is conducted at least every three weeks or more often. *Id.* In this manner, the agency ensures that as FBI responses are received, files are expeditiously released for adjudication. *Id.*

**D. The FBI Name Check**

The FBI's National Name Check Program's mission is to disseminate information from the FBI's Central Records System (CRS) in response to requests from federal agencies such as USCIS. Declaration of Michael Cannon ¶ 4. The CRS contains the FBI's administrative, personnel and investigative files. *Id.* ¶ 5. The Program has grown exponentially since its genesis in the Eisenhower administration, with more and more customers (federal agencies, the federal judiciary, friendly foreign police and intelligence agencies, and state and local criminal justice agencies) seeking background information from FBI files on individuals before bestowing a privilege, such as government employment, a security clearance, attendance at a White House function, a green card or naturalization, admission to the bar, or a visa. *Id.* ¶ 4. More than 70 federal, state, and local agencies regularly request FBI name searches. *Id.*

When the FBI searches a person's name, the name is electronically checked against the FBI's Universal Index. Cannon Declaration ¶ 11. The searches seek all instances of the individual's name, social security number, and dates close to his or her date of birth, whether a main file or reference file. *Id.* The names are searched in a multitude of combinations, switching the order of first, last and middle names, and so on. *Id.* If there is a match with a name in a FBI record, it is designated as a "Hit," meaning that the system has stopped on a possible match with the name being checked. Cannon Declaration ¶ 12. If a search comes up with a match to a name and either a birth date or security number, it is designated an "Ident." *Id.*

There are four stages involved in the completion of an individual name check: batch processing, name searching, file review, and dissemination. Cannon Declaration ¶ 13. The first stage in the process, batch processing, involves the transfer of the name check requests from USCIS to the Name Check Programs on magnetic tapes. *Id*. The tapes are uploaded into an FBI system and the names are electronically checked against the FBI's Universal Index (UNI). Historically, during the batch processing stage, approximately 68 percent of name checks submitted by USCIS are electronically checked and returned to USCIS as having "No Record"

within 48-72 hours. Cannon Declaration ¶ 13. A "No Record" indicates that the FBI's Universal Index database contains no identifiable information regarding a particular individual. *Id.*

The second stage in the process is name searching. Cannon Declaration ¶ 14. For the name check requests that are still pending after the initial electronic check, additional review is required. *Id.* An FBI employee in the Name Check Program physically enters the applicant's name into the computer database searching different fields and information. *Id*. A secondary manual name search completed typically within 30-60 days historically identifies an additional 22 percent of the USCIS requests as having "No Record," for a 90 percent overall "No Record" response rate. *Id*. The results of this 22 percent also are returned to USCIS. *Id.*

The third and fourth stages in the process are file review and dissemination. Cannon Declaration ¶ 15. The remaining 10 percent are identified as possibly being the subject of an FBI record. *Id.* At that point, the FBI record must be retrieved and reviewed. *Id*. If the record was electronically uploaded in the FBI;s electronic record-keeping system, it can be reviewed quickly. *Id.* If not, however, the relevant information must be retrieved from an existing paper record. *Id.* Review of this information will determine whether the information is identified with the request. *Id.* If the information is not identified with the request, the request is closed as a "No Record" and USCIS is so notified. *Id.* Additional searches against the FBI's Universal Index, additional manual name searches, and/or additional file review of a name check request, depending on the length of time a name check request is pending in the processing queue, may occur periodically during the name check process to ensure that stale information is updated. Cannon Declaration ¶ 16.

Once a record is received, the FBI reviews the file for possible derogatory information. Cannon Declaration ¶ 17. Less than 1 percent of USCIS's requests are identified with a file containing possible derogatory information. *Id.* If appropriate, the FBI forwards a summary of the derogatory information to USCIS. *Id*.

At each stage of the processing, the Name Check Program generally follows a first-in, first-served protocol. Cannon Declaration ¶ 18. This protocol reflects that all applicants are equally deserving and ensures that all applicants are treated fairly. *Id.* However, if an applicant's name

check requires a review of numerous FBI records and files, even though that person came in first, the name check may require additional time until all responsive records are located and reviewed. *Id.* The general exception to the first-in, first-served policy exists when USCIS directs that a name check be handled on an "expedited" basis. Cannon Declaration ¶ 19. USICS determines which name checks are to be expedited based on criteria it determines. *Id.* Once designated as an "expedite," that name check proceeds to the front of the queue along with other prioritized name check requests, in front of the others waiting to be processed. *Id.*

Prior to September 11, 2001, the FBI processed approximately 2.5 million name checks per year. Cannon Declaration ¶ 21. As a result of the FBI's post-9/11 counterterrorism efforts, the number of name checks has grown. *Id.* For fiscal year 2006, the FBI processed in excess of 3.4 million name checks. *Id.*

A significant portion of the incoming name checks submitted over the past few years has been submitted by USCIS. Cannon Declaration ¶ 22. In fiscal year 2003, 64% of the total incoming name checks were submitted by USCIS; in fiscal year 2004, 46% of the total incoming name checks were submitted by USCIS; in fiscal year 2005, 45% of the total incoming name checks were submitted by USCIS; in fiscal year 2006, 45% of the total incoming name checks were submitted by USCIS. *Id.*

In November of 2002, heightened national security concerns prompted a review of the former INS's procedures for investigating the backgrounds of individuals seeking immigration benefits. Cannon Declaration ¶ 23. It was determined that deeper, more detailed clearance procedures were required to protect the people and the interests of the United States effectively. *Id.* One of the procedures identified was the FBI's name check clearance. *Id.* In December of 2002, and January of 2003, the former INS resubmitted 2.7 million name check requests for background investigations of all individuals with then-pending applications for immigration benefits for which the Immigration and Nationality Act required background investigations. Cannon Declaration ¶ 24. Those 2.7 millions requests were in addition to the regular submissions by the former INS. *Id.* Currently, the FBI has returned an initial response to all 2.7 million resubmitted requests. *Id.* Moreover, although many of the FBI's initial responses to those resubmitted requests indicated

1 that the FBI had no information relating to the specific individual who was the subject of the
2 request, approximately 16 percent – or over 440,000 — resubmitted requests indicated that the FBI
3 may have information relating to the subject of the inquiry. *Id.* Currently, less than 6,300 of those
4 resubmitted requests remain pending. *Id*.

5 The FBI's processing of those 440,000 resubmissions has delayed the processing of regular
6 submissions from USCIS. Cannon Declaration ¶ 25. A dedicated team with the FBI's National
7 Name Check Program has been assigned to handle only the re-submitted submissions from USCIS.
8 *Id*. To the extent the team members are working on only these applications, they are unavailable
9 to process the normal submissions which are completed on a first-in, first-out basis, unless
10 otherwise directed by USCIS. *Id*.

11 There are numerous factors that contribute to delays in the processing of name checks. Cannon
12 Declaration ¶ 26. One is the volume of incoming name checks – the total volume of name check
13 requests currently outpaces the FBI name check program's available resources to process the
14 incoming volume, in addition to being able to process those name checks currently pending. *Id*.
15 As it concerns submissions by USCIS, the fiscal year 2006, USCIS submitted approximately
16 1,633,000 name check requests, of which approximately 718,000 represented naturalization-
17 related name checks and approximately 658,000 represented adjustment of status-related name
18 checks. *Id*. As of the end of fiscal year 2006, the Name Check Program had over 364,600 pending
19 USCIS name check requests, of which over 157,300 represented naturalization-related name
20 checks and over 157,800 represented adjustment of status-related name checks. *Id.*

21 Second, the number of "hits" on a name when it is reviewed may further contribute to a delay
22 in processing a name check request. Cannon Declaration ¶ 27. A "hit" is a possible match with a
23 name in an FBI record. *Id*. The number of times the name appears in an FBI record correlates to
24 the number of records which require review. *Id.*

25 Third, the processing of common names also contributes to a delay in processing a name check
26 request. Cannon Declaration ¶ 28. The names associated with a name check request are searched
27 in a multitude of combinations, switching the order of first, last, and middle names, as well as
28 combinations with just the first and last, first and middle, and so on. *Id*. Without detailed

information in both the file and agency submissions, it is difficult to determine whether or not a person with a common name is the same person mentioned in FBI records. *Id.* Common names can often have more than 200 FBI records. *Id.*

Fourth, the accessibility of the FBI record needed for review also contributes to a delay in processing a name check request. Cannon Declaration ¶ 29. If the date of the record is later than October 1995, the record text may be available electronically; if the record predates October 1995, the paper record has to be located, pulled, and reviewed. *Id.* A record could be at one of year 265 possible locations across the country. *Id.* Requests often involve coordinating the retrieval and review of files from the various 56 different FBI field offices. *Id.* One person's name check may involve locating and reviewing numerous files, all at different physical locations. *Id.* Since is a paper-based process, it is a process subject to misplaced or misfiled files. *Id.* The process is time consuming and labor intensive. *Id*.

Fifth, processing a request to expedite the processing of an FBI name check means that an employee is not available to work on a normal name check request. Cannon Declaration ¶ 30.

The FBI is seeking a number of improvements to its process. Cannon Declaration ¶ 31. The FBI is continuing to develop its Name Check Dissemination Database, an electronic repository for name check results, to eliminate manual and duplicate preparation of reports to other agencies, and provide avenues for future automation of the name check process. *Id.* ¶ 32. The FBI is partnering with other agencies to provide contractors and personnel to process name checks. *Id*. ¶ 33. The FBI is in the process of hiring additional employees to fill current vacancies and has procured an employee development program to streamline the training of new employees, thereby significantly decreasing the amount of time needed before a new employee can begin to significantly impact the name check workload. *Id*. ¶ 34. The FBI is scanning paper files required for review in order to provide machine readable documents for the Dissemination database and is building an Electronic Records System that allows for future automation of the name check process. *Id.* ¶ 35. The FBI is working with customers to streamline incoming product and to automate exchange of information. *Id.* ¶ 36. As a mid-term improvement, the FBI is exploring technology updates to the name check process. *Id*. ¶ 37. Specifically, the FBI procured textual

analysis software in order to investigate ways to further automate the name check process. *Id.* As a long-term improvement, the FBI is developing a Central Records Complex that will create a central repository of records. *Id.* ¶ 38. As a long-term improvement, the FBI is developing a Central Records Complex that will create a central repository of records. Heinauer Declaration ¶ 38. Currently, paper files/information must be retrieved from over 265 locations throughout the FBI. The Central Records Complex will address this issue, creating a central repository, scanning of documents, and expediting access to information contained in billions of documents that are currently manually accessed in locations around the United States and world. *Id.*

### D. The Plaintiffs' I-485 Applications

The plaintiffs filed their I-485 applications on April 27, 2005. Heinauer Declaration ¶ 3. Plaintiff Jin Wu's I-485 application is based on a Form I-140 immigrant visa petition for alien worker which was filed on her behalf by her employer, Synopsys, Inc., on October 20, 2004. Heinauer Declaration ¶ 7. The Form I-140 visa petition was approved on April 6, 2005. *Id.* Plaintiff Chang Zhang is a derivative spouse of Plaintiff Jin Wu. Heinauer Declaration ¶ 4. Plaintiff Zhang's I-485 application cannot be adjudicated until Plaintiff Wu's I-485 application, as the principal worker's case, is completed. *Id.*

Plaintiff Wu enjoys lawful nonimmigrant status in the United States as an H-1B temporary worker with authorization to remain in the United States and work for her petitioning nonimmigrant employer, Synopsys, Inc., through February 1, 2009. Heinauer Declaration ¶ 5. This status may be extended upon request by the employer, or Plaintiff may obtain a work permit, based on her pending adjustment application, to work for any U.S. employer. *Id.*

Plaintiff Zhang enjoys lawful nonimmigrant status in the United States in his own right as an H-1B worker for his employer, Acellent Technologies, Inc., valid through July 1, 2009. Heinauer Declaration ¶ 6.

Upon receipt of the plaintiffs' original I-485 applications, USCIS initiated the FBI name check process on November 26, 2003.[1] Heinauer Declaration. The FBI acknowledged receipt of the

---

[1]The plaintiffs' original I-485 applications were denied by USCIS on June 22, 2004. Heinauer Declaration ¶¶ 3-4. As explained in the declaration of Gerald Heinauer, the denial of

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
C 07-3118-PVT                                             10

name check requests on December 3, 2003. *Id.*; Cannon Declaration ¶¶ 43-44. The FBI completed the name check for plaintiff Zhang on August 7, 2007.[2] Cannon Declaration ¶ 44. The FBI has not yet completed the name check for plaintiff Wu. Cannon Declaration ¶ 43. The plaintiffs' I-485 applications are ready to be adjudicated upon receipt of plaintiff Wu's FBI name check result. Heinauer Declaration ¶¶ 9, 14, 15.

While the plaintiffs' I-485 applications are pending, both plaintiffs have work authorization documents which allow them to work with any U.S. employer valid through June 6, 2008. Heinauer Declaration ¶ 27. Moreover, while the plaintiffs' I-485 applications are pending, both plaintiffs have advance parole travel documents, valid through June 11, 2008, which allow them to travel abroad. *Id.*

### III. SUMMARY JUDGMENT METHODOLOGY

This Court shall grant summary judgment when it finds that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Nunes v. Wal-Mart Stores, Inc.*, 164 F.3d 1243, 1246 (9th Cir. 1999).

### IV. ARGUMENT

**A. The Only Proper Defendant is DHS**

Since March 1, 2003, the Department of Homeland Security has been the agency responsible for implementing the Immigration and Nationality Act. *See* 6 U.S.C. §§ 271(b)(5), 557. Thus, the only relevant Defendant here is DHS. Accordingly, the government respectfully asks this Court to dismiss defendants Gonzales (now Michael Mukasey) and Gonzalez. *See Konchitsky v. Chertoff*, No. C-07-00294 RMW, 2007 WL 2070325, at *6-7 (N.D. Cal. July 13, 2007); *Dmitriev v. Chertoff,* No. C 06-7677 JW, 2007 WL 1319533, at *4 (N.D. Cal. May 4, 2007); *Clayton v. Chertoff*, C-07-2781-CW (N.D. Cal. Oct. 1, 2007).

---

the plaintiffs' original I-485 applications does not affect the FBI's ongoing processing of the name checks. Heinauer Declaration ¶ 18.

[2]Although the FBI has completed the name check for Plaintiff Zhang, his I-485 application cannot be adjudicated until his wife's I-485 application is adjudicated, because he is a derivative spouse. Heinauer Declaration ¶ 18.

**B. Relief Is Unavailable Under The Mandamus Act and the APA**

The defendants recognize that this Court has held to the contrary in *Chao v. Gonzales*, C-07-1562-PVT, 2007 WL 3022548 (N.D. Cal. Oct. 15, 2007), and *Abbasfar v. Chertoff*, C-07-1155-PVT, 2007 WL 2409538 (N.D. Cal. Aug. 21, 2007), but nevertheless assert that relief is unavailable under the mandamus act or the APA.

Mandamus is reserved for those situations in which the agency has a ministerial, nondiscretionary duty that is so plainly prescribed as to be free from doubt. *See Kildare v. Saenz*, 325 F.3d 1078, 1084 (9th Cir. 2003). A ministerial act is "devoid of the exercise of judgment or discretion." *Harmon Cove Condominium Ass'n, Inc. v. Marsh*, 815 F.2d 949, 951 (3d Cir. 1987). A duty is ministerial "where the officer can do only one thing." *Work v. United States*, 267 U.S. 175, 177 (1925). Courts have consistently recognized that "the remedy of mandamus is a drastic one, to be invoked only in extraordinary situations." *Allied Chemical Corp. v. Daiflon, Inc.*, 449 U.S. 33, 34 (1980).

Similarly, a court has jurisdiction to act under section 706(1) of the APA (authorizing courts to "compel agency action . . . unreasonably delayed") only when "an agency is compelled by law to act within a certain time period," but the agency has failed to comply with that time period. *See Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 65 (2004). As an example, the Supreme Court in *Norton* stated that the Federal Communications Commission's failure to establish regulations within 6 months of the date of the Telecommunications Act of 1996, as required by the Act, "would have supported a judicial decree under the APA requiring the prompt issuance of regulations." *See id.* "The principal purpose of the APA limitations we have discussed – and of the traditional limitations upon mandamus from which they are derived – is to protect agencies from undue judicial interference with their lawful discretion, and to avoid judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve." *Norton*, 542 U.S. at 66.

The adjudication of an adjustment of status application is a matter committed to the discretion of USCIS. *See* 8 U.S.C. § 1255(a) (an alien's status "may be adjusted by the Attorney General, in his discretion and under such regulations as he may prescribe."); 8 C.F.R. § 103.2(b)(7) ("[The

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
C 07-3118-PVT                                            12

agency] may direct any necessary investigation"); 8 C.F.R. § 103.2(b)(18) ("A district director may authorize withholding adjudication"); 8 C.F.R. § 245.6 (an "interview may be waived . . . when it is determined by the Service that an interview is not necessary"). Moreover, the processing of an individual's name check is a matter committed to the discretion of the FBI. *See Yan v. Mueller*, No. H-07-0313, 2007 WL 1521732, at * 6 (S.D. Tex. May 24, 2007) ("The evidence shows that the delay is due, not only to the volume of requests that the FBI receives, but also to the FBI's exercise of discretion in determining the timing for conducting the many name check requests that it receives and the manner in which to conduct those checks."); *see also Shalabi v. Gonzales*, 2006 WL 3032413, at *5 (E.D. Mo. Oct. 23, 2006) ("A background check that is rushed or incomplete due to an artificial court imposed deadline would not meet the statutory and regulatory requirements of a 'full criminal background check' before the USCIS can make a determination on an application."); *id*. ("There is no statute or regulation which imposes a deadline for the FBI to complete a criminal background check."); *Sozanski v. Chertoff*, No. 06-CV-0993 (N.D. Tex. Dec. 11, 2006) (holding that district court lacks jurisdiction to compel the FBI to perform name checks in adjustment of status cases).

The agencies' discretion precludes judicial review of both the ultimate decision on an individual's I-485 application *and* the process by which the decision is reached. In *Heckler v. Chaney*, 470 U.S. 821 (1985), the Supreme Court interpreted 5 U.S.C. § 701(a)(2) to mean that "review is not to be had if the statute is drawn so that the court would have no meaningful standard against which to judge the agency's exercise of discretion." *Id.* at 830. As the Court went on to explain, "if no judicially manageable standards are available for judging how and when an agency should exercise its discretion, then it is impossible to evaluate agency action for 'abuse of discretion.'" *Id.* (emphasis added)**.**

Here, there are no statutory or regulatory provisions which provide a "meaningful standard" against which to measure the time it takes the FBI to complete a name check or for USCIS to process an application. Without any mandatory time frames, in order to determine that the agencies have "unreasonably delayed" adjudication of the plaintiffs' I-485 applications, this Court would have to create a temporal standard from thin air. This is a perilous task given the national

1  security considerations that affect the FBI's and USCIS's respective roles in the I-485 process.
2  Although USCIS must eventually notify an applicant of its decision on a I-485 application, *see* 8
3  C.F.R. § 245.2, the applicant is not entitled to a decision within any particular time frame. *See*
4  *Sharif v. Chertoff*, ___ F. Supp. 2d ___, 2007 WL 2045489, at * 5 (N.D. Ill. July 18, 2007).

5  Congress clearly knows how to provide a deadline for processing an application for an
6  immigration benefit, but chose to remain silent in the context of I-485 applications. For example,
7  Congress provided that an application for naturalization must be processed within 120 days after
8  the date the applicant is examined. *See* 8 U.S.C. § 1447(b). The Immigration and Nationality Act
9  provides no time frame for processing an I-485 application. Accordingly, under *Norton*, this Court
10 is unable, under either the mandamus statute or the APA, to direct USCIS to act within a specific
11 time period on the plaintiff's I-485 application. *See Norton*, 542 U.S. at 65.

12 Finally, the granting of a writ of mandamus to compel the processing of routine immigrant
13 applications out of order would have several negative repercussions. First, it would unfairly favor
14 applicants with the means to hire an attorney and file federal mandamus actions. Applicants
15 without the resources to bring such actions would suffer further delays in the processing of their
16 applications, because other later-filed applications would be given court-mandated preferential
17 treatment. Second, allowing immigration applicants to use mandamus to "cut in line," would open
18 the floodgates for immigration-related mandamus actions. The use of mandamus in immigration
19 matters would shorten the delay for some, only to lengthen it for others. An equitable solution to
20 the processing delays lies not with the Judicial branch, but with the Executive and Legislative
21 branches of government, for only these branches of government can properly address the budget
22 and staffing issues that have caused the delays to occur.

23 In sum, the defendants have no clear, mandatory duty to process a name check or to adjudicate
24 the plaintiffs' I-485 applications within any particular time frame. In failing to specify any
25 temporal limitations, and in leaving it to the agency to prescribe any appropriate regulations,
26 Congress vested the agencies with complete discretion over the process of adjudicating an I-485
27 application. Accordingly, this Court lacks jurisdiction over the plaintiff's mandamus and APA
28 claims. *See Li v. Chertoff*, 482 F. Supp. 2d 1172, 1177 (S.D. Cal. 2007); *Zheng v. Reno*, 166 F.

Supp. 2d 875, 880-81 (S.D. Cal. 2001) ("Matters within the INS's discretion are not reviewable under the mandamus statute. Thus, courts in this district have repeatedly held that mandamus relief is unavailable for delays in the adjustment process."); *Safadi v. Howard*, 466 F. Supp. 2d 696, 698-700 (E.D. Va. 2006) (concluding that § 1255(a) vests USICS with discretion over the entire process of adjustment application adjudication); *Grinberg v. Swacina*, 478 F. Supp. 2d 1350, 1351 (S.D. Fla. 2007) ("Sections 242 and 245 of the Immigration and Nationality Act . . . preclude judicial review of any discretionary "decision or action' of the Attorney General in immigration matters includ[ing] the pace at which immigration decisions are made.").[3]

### C.  8 U.S.C. § 1252(a)(2)(B)

The defendants recognize that this Court has held to the contrary in *Abbasfar v. Chertoff*, C-07-1155-PVT, 2007 WL 2409538 (N.D. Cal. Aug. 21, 2007), but nevertheless assert that this Court is barred from reviewing this action under 8 U.S.C. § 1252(a)(2)(B), which provides:

(B) Denials of discretionary relief

> Notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of Title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, and except as provided in subparagraph (D), and regardless of whether the judgment, decision, or action is made in removal proceedings, **no court shall have jurisdiction to review --**
>
> (i) **any judgment regarding the granting of relief** under section 1182(h), 1182(i), 1229b, 1229c, or 1255 of this title, or
>
> (ii) **any other decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this subchapter to be in the discretion of the Attorney General or the Secretary of Homeland Security**, other than the granting of relief under section 1158(a) of this title.

8 U.S.C. § 1252(a)(2)(B) (emphasis added)

---

[3] The defendants acknowledge that a number of other courts, including the judges in this district that have considered the issue, have held to the contrary. *See, e.g., Dong v. Chertoff*, C-07-266-SBA, 2007 WL 2601107 (N.D. Cal. 2007); *Clayton v. Chertoff*, C-07-2781-CW, 2007 WL 2904049 (Oct. 1, 2007) *Konchitsky v. Chertoff*, 2007 WL 2070325, at *3 (N.D. Cal. 2007); *Toor v. Still*, 2007 WL 2028407, at *2 (N.D. Cal. 2007); *Fu v. Gonzales*, C-07-207 (N.D. Cal. 2007); *Dmitriev v. Chertoff*, 2007 WL 1319533, at *3 (N.D. Cal. 2007); *Wu v. Chertoff*, 2007 WL 1223858, at *3 (N.D. Cal. 2007); *Baker v. Still*, 2007 WL 1393750, at *2 (N.D. Cal. 2007); *Gelfer v. Chertoff*, 2007 WL 902382 (N.D. Cal. 2007); *Singh v. Still*, 470 F. Supp. 2d 1064, 1067 (N.D. Cal. 2007); *Yu v. Chertoff*, 2007 WL 1742850 (N.D. Cal.) *Yu v. Brown*, 36 F. Supp. 2d 922, 932 (D.N.M. 1999).

8 U.S.C. § 1255, to which 8 U.S.C. § 1252(a)(2)(B) refers, provides:

> (a) Status as person admitted for permanent residence on application and eligibility for immigrant visa
>
> **The status of an alien** who was inspected and admitted or paroled into the United States or the status of any other alien having an approved petition for classification as VAWA self-petitioner **may be adjusted by the Attorney General, in his discretion and under such regulations as he may prescribe**, to that of an alien lawfully admitted for permanent residence if (1) the alien makes an application for such adjustment, (2) the alien is eligible to receive an immigrant visa and is admissible to the United States for permanent residence, and (3) an immigrant visa is immediately available to him at the time his application is filed.

8 U.S.C. § 1255 (emphasis added).

The reference in 8 U.S.C. § 1252(a)(2)(B)(ii) to "action of the Attorney General or the Secretary of Homeland Security" encompasses the pace at which USCIS processes an I-485 application. In *Safadi v. Howard*, 466 F. Supp. 2d 696 (E.D. Va. 2006), for example, the United States District Court for the Eastern District of Virginia concluded that the term "action," "encompasses any act or series of acts that are discretionary within the adjustment of status process . . . action . . . encompasses the entire process of reviewing an adjustment application, including the completion of background and security checks and the pace at which the process proceeds." *Safadi*, 466 F. Supp. 2d at 699; *see also Grinberg v. Swacina*, 478 F. Supp. 2d 1350 (S.D. Fla. 2007) (electing "to follow the majority of courts that have dismissed similar actions for lack of subject matter jurisdiction, under the rationale that Sections 242 and 245 of the [INA], 8 U.S.C. §§ 1255(a), 1252(a)(2)(B)(ii) (2006, as amended in 2005, preclude judicial review of any discretionary 'decision or action' of the Attorney General in immigration matters"); *Li v. Chertoff*, 482 F. Supp. 2d 1172, 1177 (S.D. Cal. 2007) ("These statutes clearly convey Congress' intent to preclude courts from reviewing discretionary decisions or actions of USCIS regarding I-485 applications"); *Eldeeb v. Chertoff*, 2007 WL 2209231, at *13 (M.D. Fla. 2007) ("Therefore, this Court has elected to interpret the § 1252(a)(2)(B)(ii) jurisdictional bar broadly, and has concluded that the pace of adjudication of an 1485 application is a discretionary function of the CIS"); *see also Borisov v. Gonzales*, CV 06-8240-VBF; *Mustafa v. Pasquerell*, No. Civ.SA05CA-658-XR, 2006 WL 488399 (W.D. Tex. Jan. 10, 2006); *Zaytsev v. Gantner*, No. 04Civ.7101 WHP, 2004 WL 2251665 (S.D.N.Y. Sept. 24, 2004). *But see Dong v. Chertoff*, C-07-266-SBA, 2007 WL 2601107

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
C 07-3118-PVT                                    16

(N.D. Cal. Sept. 6, 2007) (rejecting argument that 8 U.S.C. § 1252(a)(2)(B)(ii) deprives the court of jurisdiction to hearing a claim that an adjudication of an adjustment of status application has been unlawfully withheld); *Cao v. Upchurch*, ___ F. Supp. 2d ___, 2007 WL 2071900, at *2 (E.D. Pa. 2007) ("While 8 U.S.C. § 1255(a) specifically places the decision of whether to adjust status in the discretion of the Attorney General, it says nothing about the pace of such a decision, and certainly does not confer on the Attorney General discretion to let a petition languish indefinitely"); *Elmaky v. Upchurch*, No. 3:06-CV-2359-B, 2007 WL 944330 (N.D. Tex. Mar. 28, 2007); *Duan v. Zamberry*, 2007 WL 626116, at *2 (section 1252(a)(2)(B)(ii) strips jurisdiction to review only those decisions within the Attorney General's discretion as specified in the statute, namely, the decision to adjust status, not the pace of the application processing).

"[T]he ultimate decision to grant or deny an application lies within the discretion of the USCIS. It would make little sense to allow a court to review the pace of processing of an application, where the ultimate decision to grant or deny an application is entrusted to the discretion of the agency." *Borisov v. Gonzales*, CV 06-8240-VBF, at 7.

In sum, the defendants respectfully ask this Court to conclude that it lacks jurisdiction to review the pace at which the FBI and USCIS complete the name check and adjudicate the plaintiffs' I-485 applications.

**D. The Delay is Reasonable**

Even if this Court were to find jurisdiction, the defendants have not unreasonably delayed adjudication of the plaintiffs' I-485 applications.

First, the USCIS promptly asked the FBI to conduct name checks of the plaintiffs (on November 26, 2003) within one week of when the plaintiffs filed their I-485 applications. Accordingly, the plaintiffs cannot establish any delay in initiating the name check process. Heinauer Declaration ¶¶ 18, 19.

Second, while waiting for the completion by the FBI of the plaintiffs' name checks, the USCIS has completed fingerprinting of the plaintiffs and has completed the other necessary background checks of the plaintiffs. Heinauer Declaration ¶¶ 14, 15. Accordingly, the plaintiffs' I-485 applications can be adjudicated once the FBI completes Plaintiff Wu's name check. Heinauer

1 | Declaration ¶ 14.

2 | Third, the amount of time that the FBI takes to resolve a name check should be viewed in light of the staggering numbers of name checks the FBI is processing on a yearly basis – for fiscal year 2006 alone, the FBI processed in excess of 3.4 million name checks, *see* Cannon Declaration ¶ 21, the numerous causes for delay in completion of an individual's name check, see Cannon Declaration ¶¶ 26-30, and the steps the FBI is taking to address the factors that contribute to delays in processing a name check, see Cannon Declaration ¶¶ 31-38.

Fourth, any requirement that the FBI or USCIS process the plaintiffs' name checks or I-485 applications within a particular time limit will have the unfortunate side effect of slowing the processing for other applicants who are also awaiting action on their applications for immigration benefits. Heinauer Declaration ¶¶ 23-26. Absent compelling reasons, moving some individuals to the front of the queue would simply move that group ahead of others who also had been waiting, resulting in no net gain in processing. *See id.*

Fifth, during the time that an I-485 application is pending, an applicant may apply for and receive employment authorization and travel authorization for the entire time that his or her I-485 application is pending. Each of the plaintiffs in this case have employment and travel authorization. Heianuer Declaration ¶ *27*

In sum, given the large volume of applications USCIS must adjudicate, the extensive background check that is required for national security and public safety, the exponential growth in the number of name checks the FBI must complete, the limited resources available to the agencies, and the documented steps the agencies have taken to complete adjudication of the plaintiffs' I-485 applications, the FBI and the USCIS are proceeding in an orderly and timely fashion with the completion of name check and the adjudication of the plaintiffs' I-485 applications.

**V. CONCLUSION**

For the foregoing reasons, the defendants respectfully ask this Court to deny the plaintiffs' motion for summary judgment, grant the defendants' motion for summary judgment, and dismiss the plaintiffs' action in its entirety.

Dated: January 8, 2008                                    Respectfully submitted,

JOSEPH P. RUSSONIELLO
United States Attorney


           /s/
EDWARD A. OLSEN
Assistant United States Attorney